# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39001**

————————————

**UNITED STATES**
*Appellee*

**v.**

**David R. ALLEN**
Master Sergeant (E-7), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 11 August 2017

————————————

*Military Judge:* Donald R. Eller, Jr.

*Approved sentence:* Bad-conduct discharge, confinement for 1 year, reduction to E-3, and a reprimand. Sentence adjudged 17 October 2015 by GCM convened at Ramstein Air Base, Germany.

*For Appellant:* Major Annie W. Morgan, USAF; Brian L. Mizer, Esquire.

*For Appellee:* Lieutenant Colonel Lance R. Smith, USAF; Major Collin F. Delaney, USAF; Major Mary Ellen Payne, USAF; Captain Matthew L. Tusing, USAF; Gerald R. Bruce, Esquire.

Before DREW, HARDING, and MINK, *Appellate Military Judges*.

Chief Judge DREW delivered the opinion of the court, in which Senior Judge HARDING and Judge MINK joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

DREW, Chief Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of two specifications of dereliction of duty by willfully

failing to refrain from pursuing an unprofessional sexual relationship with two junior Airmen, including Airman First Class (A1C) CG, in violation of Article 92(3), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 892(3); two specifications of dereliction of duty by willfully failing to refrain from pursuing an unprofessional dating relationship with two other junior Airmen, also in violation of Article 92(3); and one specification of sexual assault of A1C CG, in violation of Article 120, UCMJ, 10 U.S.C. § 920.[1] The court-martial sentenced Appellant to a bad-conduct discharge, confinement for one year, reduction to E-3, and a reprimand. The convening authority approved the adjudged sentence.

Appellant raises several assignments of error on appeal: (1) whether the unprofessional relationship specifications are void for vagueness; (2) whether the evidence is factually and legally sufficient to prove Appellant was derelict in his duties by pursuing unprofessional relationships; (3) whether the evidence is factually and legally sufficient to prove Appellant sexually assaulted A1C CG; (4) whether the military judge abused his discretion in denying a Defense request to reopen sentencing based on newly discovered evidence;[2] (5) whether the military judge abused his discretion in denying a Defense re-

---

[1] After arraignment but before the members were sworn, the convening authority withdrew and dismissed a specification of rape, in violation of the version of Article 120, UCMJ, applicable on or before 30 September 2007. At the close of findings, the military judge granted a motion for a finding of not guilty, in accordance with Rule for Courts-Martial (R.C.M.) 917, as to a specification of abusive sexual contact of A1C CG, in violation of Article 120, but permitted the Prosecution to proceed with the lesser included offense of attempted abusive sexual contact, in violation of Article 80, UCMJ, 10 U.S.C. § 880. The court-martial acquitted Appellant of the attempted abusive sexual contact offense and of an additional specification of dereliction of duty by willfully failing to refrain from pursuing an unprofessional dating relationship with yet another junior Airman.

[2] The evidence Appellant asserts was newly discovered was a text message sent by A1C CG to a staff sergeant in her unit after she was granted an expedited transfer and early release from active duty. Appellant contends that the text message is evidence of A1C CG's manipulative character to "work the system." The text message came into the custody of the Defense during the sentencing hearing. We leave for another day the question of whether, in a litigated members case, evidence discovered after the members have announced their findings in open court but before the adjournment of the court-martial is discovered "after the trial." *See* R.C.M. 1210(f)(2)(A); *see also Manual for Courts-Martial, United States* (2012 ed.) (*MCM*), App. 21, at A21–98 ("Article 73 authorizes a petition for new trial of the facts when there has been a trial. When there is a guilty plea, there is no trial.").

quest to reopen findings based on newly discovered evidence;[3] and (6) whether the military judge abused his discretion in giving a false exculpatory statement instruction to the members. In addition, Appellant personally filed a very lengthy document, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). However, to the degree Appellant's personal filing raises issues appropriate for our consideration that were not already addressed by his appellate counsel in their brief and assignments of error, they do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

Appellant also petitioned The Judge Advocate General of the Air Force for a new trial based on the newly discovered evidence Appellant raises in issues (4) and (5) above. That request was forwarded to this court. *See* Rule for Courts-Martial 1210(e). In light of our decision below finding the evidence factually insufficient to prove Appellant sexually assaulted A1C CG, Appellant's petition for a new trial[4] and issues (4) through (6) are moot. We also find that the specification alleging an unprofessional relationship with A1C CG is factually insufficient. We affirm the remaining dereliction of duty

---

[3] We note that Appellant never requested to reopen findings. This is not surprising as the military judge had no authority to allow it. Both Appellant's and the Government's briefs now cite to *United States v. Fisiorek*, 43 M.J. 244 (C.A.A.F. 1995). In particular, Appellant quotes: "It is now beyond doubt in military jurisprudence that a military judge is empowered to reopen a case even after findings have been announced." 43 M.J. at 247. A1C Fisiorek's court-martial occurred in December 1989. At that time, R.C.M. 924(a), *Manual for Courts-Martial, United States* (1984 ed.), which was based on longstanding military jurisprudence and the *Manual for Courts-Martial, United States*, ¶ 74*d*(3) (1969 rev. ed.), read "*Time for reconsideration.* Members may reconsider any finding reached by them before such finding is announced in open session. Members may reconsider any finding of guilty reached by them at any time before announcement of sentence." However, in 1995, several years after A1C Fisiorek's trial, the President deleted the second sentence of R.C.M. 924(a), removing the authority for court members to reconsider a finding of guilty after it has been announced in open session. Thus, without the ability of court members to reconsider their guilty findings, the military judge could not have reopened the findings case once the court members announced their findings in open session. *See United States v. Thompson*, 59 M.J. 432, 440 (C.A.A.F. 2004) ("When the panel announced its findings in open court, those findings were final and were not subject to reconsideration by the members."); *see also United States v. Anderson*, 55 M.J. 198, 202 (C.A.A.F. 2001) ("The version of RCM 924(a) in effect at the time of appellant's trial did not permit court members to reconsider findings after they are announced.").

[4] *See Allen v. United States*, Misc. Dkt. No. 2017-02, slip op. (A.F. Ct. Crim. App. 11 Aug. 2017) (unpub. op.).

specifications, set aside the sentence, and remand the case for a rehearing on sentence.

## I. BACKGROUND

Appellant, an unmarried male master sergeant (E-7), was the Unit Training Monitor for the 24th Intelligence Squadron (24 IS) at Ramstein Air Base, Germany. Each of the junior Airmen listed in the dereliction specifications was an unmarried female who held the rank of A1C (E-3) at the time of the offenses and was also assigned to 24 IS, except for A1C CG, who was an unmarried female assigned to another squadron. As part of his official duties, Appellant in-processed the 24 IS Airmen, provided them counseling on their upgrade training in the intelligence career field, and had on-going official responsibilities to monitor their training in the squadron. While A1C CG was not assigned to 24 IS, she did work in the same building as Appellant and first met him when she was in-processing into her own squadron.[5] Appellant was not A1C CG's Unit Training Monitor or supervisor. Other than being a superior noncommissioned officer in the same military service as A1C CG, Appellant and A1C CG had no official duty relationship. Unlike Appellant's relationships with the 24 IS Airmen, he had no direct or indirect organizational influence over A1C CG's duties or career.

Numerous witnesses testified that Appellant paid special attention to attractive young female Airmen during in-processing, on occasions to the detriment of male Airmen, whom he would direct to come back later to in-process with him. His favoritism was noticed not only by the junior Airmen, but also by the squadron commander's civilian executive assistant and by several noncommissioned officers in the squadron. The civilian and two technical sergeants (E-6) separately, and on different occasions, confronted Appellant with how his interactions with the junior female Airmen were being negatively perceived by others in the squadron. The Government introduced testimony about a so-called "Allen Briefing," in which newly assigned junior female Airmen were advised about Appellant's interest in attractive young females.

Appellant and A1C CG met at Ramstein Air Base, Germany, while she was touring the building that her squadron shared with Appellant's squadron. Appellant later came up to her on a Friday afternoon at the base dining facility and joined her for lunch. After they ate, Appellant offered to drive

---

[5] The Government's brief incorrectly states that "[A1C CG]'s first duty assignment required her to in-process with Appellant . . . ."

A1C CG to the Airman's Attic, where she volunteered. Later that evening, she accepted Appellant's Facebook friend request and they exchanged over 150 messages over the course of the evening and early morning. Later on Saturday, A1C CG accepted an invitation to come over to Appellant's apartment for a meal, and he picked her up and drove her to his apartment. After a tour of his apartment, Appellant went upstairs and took a shower to rinse off the chlorine from a swim he took earlier in the day.

A1C CG testified as follows:

- When Appellant returned downstairs to the living room, he sat next to her and kissed her. She moved off of the chair they were sitting on, and Appellant followed her across the room. She later went upstairs to use the restroom, and when she emerged she learned that Appellant had followed her upstairs. He groped her, and she retreated into Appellant's bedroom. Appellant removed her clothing, placed her on his bed, and disregarded her verbal protestations—such as "Sergeant Allen, you can't do this" and "Sergeant Allen, no"—and attempts to scoot away from him. At some point she told him, "If you're going to do this, if this is going to happen, wear a condom, so I don't catch any STDs." When Appellant left to get a condom, she attempted to put on her pants; however, Appellant took her pants from her. Appellant returned with a condom and had sexual intercourse with her for four to five minutes.

- After Appellant finished, she left the room to use the bathroom. After using the bathroom, she went downstairs to find Appellant making dinner. She stated that she did not flee Appellant's apartment because he was "acting normal." Appellant's "normal" response added to her confusion about how to "classify" what had happened because she thought of sexual assault as "someone getting physically beat" and Appellant "didn't do any of that . . . , he was still normal." A1C CG further testified that while preparing dinner she confronted Appellant by asking him, "[W]hy didn't you stop when I told you to stop?" To which he replied, "[Y]our mouth was saying no, but your . . . vagina was saying yes." After dinner, they watched a movie in the living room and then ended up back in Appellant's bedroom. Appellant attempted to place his penis in her mouth but she moved her head and he eventually gave up.[6] When Appellant refused to drive her back to her on-base dormitory because he had just taken prescription pain medication for a recent

---

[6] This constituted the attempted abusive sexual contact allegation, of which the court-martial acquitted Appellant.

back injury, she ended up spending the night in Appellant's bed, next to him. She testified that she did not seek to sleep on the couch because "he was going to follow, so it really didn't matter wherever I went."

When later interviewed by agents from the Air Force Office of Special Investigations (AFOSI), Appellant largely corroborated A1C CG's account, but insisted that the sexual activity was consensual. In particular, he admitted that at various times throughout the evening he would jokingly direct A1C CG to perform a task—such as get him a drink or hand him the television remote—because he was a master sergeant and she was an airman first class. Appellant also admitted that at various times during the sexual activity A1C CG did tell him to stop, but he said that it was due to difficulties in lubrication and that each time he did stop. They then tried various techniques to resolve the issue, and thereafter mutually resumed vaginal intercourse. Appellant became frustrated with the stopping and resuming, and he eventually "stopped trying." Appellant maintained that he "never finished." Upon search of Appellant's home, AFOSI discovered a condom that testing revealed contained Appellant's sperm cells. Defense counsel argued that the presence of sperm cells did not necessarily mean that Appellant ejaculated. Expert testimony on that point was ambiguous.

The morning after the alleged sexual contact, Appellant drove A1C CG back to the base and agreed to wait for her to shower and change and then drive her to the Base Exchange (BX) where she had a part-time job. According to what Appellant told investigators at the AFOSI a couple of days later, when he dropped her off at the BX, A1C CG attempted to kiss him, but he refused to allow her to kiss him in public because of their rank difference. When asked about this on cross-examination, A1C CG denied that she attempted to kiss Appellant at the BX. Appellant further told the investigators that after he rebuffed her attempt to kiss him, A1C CG became angry and stormed off. He also told them that the BX security cameras should have captured the incident; however, the investigators never attempted to retrieve the video to confirm Appellant's account.

After getting off work at the BX, A1C CG sent Appellant a series of text messages. She told him that they should not talk anymore and "To me it just seems like you just want sex from me and I'm not about to waste my time on someone who just wants sex. Need someone that I can actually get to know and vice versa instead of knowing what's in between my legs." Appellant told her he was not yet over a previous relationship and was not ready to start anything serious. She responded: "I don't never see us being serious on any level due to the fact of your current situation. Also, I just get that feeling is that's all you want and the whole sneaking around issue, I'm to [sic] grown for that."

6

The following day, A1C CG talked to her flight chief about her situation. The flight chief asked A1C CG if she hadn't gotten the "Allen Briefing." A1C CG said she had no idea what that was. Ultimately, she decided to report her encounter with Appellant as a sexual assault. Approximately two months after making her allegation, A1C CG received an expedited transfer back to the United States and separated from the Air Force early, after just two years of service.

Several witnesses testified during the Defense case-in-chief indicating that, in their opinion and assessment of her reputation, A1C CG had poor character for truthfulness. The Defense also elicited that A1C CG had made a joking comment to a friend that she liked to date men who were technical sergeants (E-6) or older, a statement that A1C CG denied.

## II. DISCUSSION

### A. Void for Vagueness

Appellant's convictions included four specifications in Charge I of dereliction of duty under Article 92(3), UCMJ, specifically two specifications for pursuing unprofessional dating relationships with two A1Cs and two specifications for pursuing unprofessional sexual relationships with two other A1Cs. Specifications 1, 3, and 4 each involved a member of Appellant's organization. Specification 5 did not. The specifications are as follows:

> Specification 1: In that [Appellant] who knew of his duties at or near Ramstein Air Base, Germany, . . . was derelict in the performance of those duties in that he willfully failed to refrain from pursuing an unprofessional sexual relationship with [A1C BN], as it was his duty to do.

> Specification 3: In that [Appellant] who knew of his duties at or near Ramstein Air Base, Germany, . . . was derelict in the performance of those duties in that he willfully failed to refrain from pursuing an unprofessional dating relationship with [A1C JS], as it was his duty to do.

> Specification 4: In that [Appellant] who knew of his duties at or near Ramstein Air Base, Germany, . . . was derelict in the performance of those duties in that he willfully failed to refrain from pursuing an unprofessional dating relationship with [A1C KV], as it was his duty to do.

> Specification 5: In that [Appellant] who knew of his duties at or near Ramstein Air Base, Germany, . . . was derelict in the performance of those duties in that he willfully failed to refrain

from pursuing an unprofessional sexual relationship with [A1C CG], as it was his duty to do.

"Article 92(3), UCMJ, requires proof of certain military duties . . . ." *United States v. Hayes*, 71 M.J. 112, 115 (C.A.A.F. 2012). The *Manual for Courts-Martial, United States* (2012 ed.) (*MCM*), pt. IV, ¶ 16.c.(3)(a), states that the duty "may be imposed by treaty, statute, regulation, lawful order, standard operating procedure, or custom of the service." To withstand a challenge on vagueness grounds, a regulation must provide sufficient notice so that a servicemember can reasonably understand that his conduct is proscribed. *United States v. Moore*, 58 M.J. 466, 469 (C.A.A.F. 2003); *see also United States v. Vaughan*, 58 M.J. 29, 31 (C.A.A.F. 2003) ("Due process requires 'fair notice' that an act is forbidden and subject to criminal sanction.") (quoting *United States v. Bivins*, 49 M.J. 328, 330 (C.A.A.F. 1998)). Sources of fair notice include military regulations. *United States v. Pope*, 63 M.J. 68, 73 (C.A.A.F. 2003). The military judge took judicial notice of the following provisions of Air Force Instruction (AFI) 36-2909, *Personnel: Professional and Unprofessional Relationships* (1 May 1999):

> This instruction establishes command, supervisory and personal responsibilities for maintaining professional relationships between Air Force members . . . .
>
> . . . .
>
> 2.2. **Unprofessional Relationships.** Relationships are unprofessional, whether pursued on or off-duty, when they detract from the authority of superiors or result in, or reasonably create the appearance of, favoritism, misuse of office or position, or the abandonment of organizational goals for personal interests. Unprofessional relationships can exist . . . between enlisted members . . . .
>
> . . . .
>
> 3.1. **Relationships Within an Organization.** Familiar relationships between members in which one member exercises supervisory or command authority over the other can easily be or become unprofessional. Similarly, differences in grade increase the risk that a relationship will be, or will be perceived to be unprofessional, because senior members in military organizations normally exercise authority or some direct or indirect organizational influence over the duties and careers of more junior members. The danger for abuse of authority is always present. The ability of the senior member to influence, directly or indirectly, assignments, promotion recommendations, duties,

awards, and other privileges and benefits, places both the senior member and the junior member in vulnerable positions. Once established, such relationships do not go unnoticed by other members of a unit. . . .

. . . .

3.3 **Dating and Close Friendships.** Dating, courtship, and close friendships between men and women are subject to the same policy considerations as are other relationships. Like any personal relationship, they become matters of official concern when they adversely affect morale, discipline, unit cohesion, respect for authority, or mission accomplishment. Members must recognize that these relationships can adversely affect morale and discipline, even when the members are not in the same chain of command or unit. The formation of such relationships between superiors and subordinates with the same chain of command or supervision is prohibited because such relationships invariably raise the perception of favoritism or misuse of position and erode morale, discipline and unit cohesion.

. . . .

3.7 **Other Relationships.** Other relationships, not specifically addressed above, can, depending on the circumstances, lead to actual or perceived favoritism or preferential treatment and, if so, must be avoided. . . .

AFI 36-2909 provides fair notice that military members have a duty to maintain professional relationships with other military members.[7] With regard to Appellant's unprofessional relationships with junior Airmen in his organization (specifications 1, 3, and 4), AFI 36-2909 put him on fair notice that his pursuit of dating and sexual relationships with subordinates, over which he had supervisory responsibility as their Unit Training Monitor, was a violation of that duty. In addition, AFI 36-2909 is evidence that the duty to avoid unprofessional relationships is not limited to personnel within a member's chain of command, as "relationships can adversely affect morale and discipline, even when the members are not in the same chain of command or unit." *Id.* ¶ 3.3. However, not all relationships outside a unit are prohibited. Other relationships become unprofessional when "depending on the circum-

---

[7] AFI 36-2909 also establishes a military member's duty to maintain professional relationships with Air Force civilian employees and government contractor employees.

stances, [they] lead to actual or perceived favoritism or preferential treatment and, if so, must be avoided." *Id.* ¶ 3.7. *See, e.g.*, *United States v. Dupree*, No. ACM S31828, 2013 CCA LEXIS 2, at *3 (A.F. Ct. Crim. App. 4 Jan. 2013) (unpub. op.) (unprofessional relationship existed between appellant, a master sergeant, and a senior airman (E-4) from another unit who served with him on the base honor guard), *rev. denied*, 72 M.J. 393 (C.A.A.F. 2013). Accordingly, AFI 36-2909 provided Appellant with sufficient notice of his duty to refrain from unprofessional relationships. A breach of that duty by failing to refrain from pursuing unprofessional relationships may properly form the basis for a violation of Article 92(3) and its corresponding criminal sanctions. Accordingly, the dereliction of duty specifications were not void for vagueness.

## B. Legal and Factual Sufficiency

### 1. Dereliction of Duty

Appellant challenges the legal and factual sufficiency of the evidence supporting the dereliction of duty convictions. We review both legal and factual sufficiency de novo. *United States v. Beatty*, 64 M.J. 456, 459 (C.A.A.F. 2007). The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). The term "reasonable doubt" does not mean that the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). As with legal sufficiency, the term "reasonable doubt" "does not mean that the evidence must be free of conflict." *United States v. Galchick*, 52 M.J. 815, 818 (A.F. Ct. Crim. App. 2000).

To sustain a conviction for dereliction of duty as alleged in the specifications of Charge I, the Government was required to prove: (1) that Appellant had a duty to refrain from pursuing an unprofessional dating or sexual rela-

tionship with each of the indicated junior Airmen; (2) that he actually knew of the duties; and (3) that he willfully was derelict in the performance of those duties.[8]

The basic facts, that Appellant pursued the female junior Airmen named in the specifications for dating or sexual relationships, were not in dispute. What Appellant did contest was whether the relationships he sought to cultivate constituted, in each instance, an unprofessional relationship. There was abundant evidence that, in carrying out his official duties as the Unit Training Manager, he showed favoritism and preferential treatment toward the three junior Airmen from his unit, as alleged in Specifications 1, 3, and 4. His unprofessional relationship with these Airmen did not go unnoticed and he was counseled by other members of the unit about the negative impact his actions were having on the unit. The evidence presented at trial as to specifications 1, 3, and 4 met all of the elements of the offense of dereliction of duty and considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. Having reviewed the entire record of trial and making allowances for not personally observing the witnesses, we are convinced of Appellant's guilt as to those specifications beyond a reasonable doubt.

The remaining dereliction of duty specification, Specification 5, which alleges that Appellant was derelict in failing to refrain from pursuing an unprofessional relationship with A1C CG, presents a different situation. Unlike the other junior Airmen, she was not assigned to Appellant's unit. Unlike the official honor guard additional duties that the appellant in *Dupree* had with the junior Airman who was not assigned to his unit, Appellant had no official duty superior/subordinate relationship with A1C CG. Many of the Prosecution witnesses emphasized the relative age differences between Appellant (37 at the time) and the junior Airmen, including A1C CG (20 at the time). However, their concern about Appellant being "too old" to pursue relationships with these women reflects not a military standard, but their own personal sense of propriety. AFI 36-2909 does not establish age differences as a basis for an unprofessional relationship and the witnesses' personal views in that regard did not establish a military duty which could form the basis for a violation of Article 92(3).

When confronted by an investigator from AFOSI with A1C CG's claim that he had sexually assaulted her, Appellant did not dispute the investigator's characterization of their relationship as "unprofessional." While that

---

[8] *MCM*, pt. IV, ¶ 16(b)(3) (2012 ed.).

was no doubt powerful evidence available to the Prosecution, his failure to dispute at the time what was a far less serious allegation than other allegations he was facing does not relieve the Prosecution from establishing a legally cognizable unprofessional relationship. In its closing argument, the Prosecution focused on the duty relationships that Appellant had with the other junior Airmen. With regard to A1C CG, they pointed to the rank difference and the fact they worked in the same building: "It was unprofessional because of the rank difference, because of the question it might raise for members when they see [Appellant] in a sexual relationship with an E-2."[9] In the absence of a duty relationship or an attempt to use superior rank to influence the duties or career of the subordinate, rank differences among enlisted members alone is not a sufficient basis to establish an unprofessional relationship. While AFI 36-2909, ¶ 3.7, does state that "[o]ther relationships, not specifically addressed above, can, *depending on the circumstances*, lead to actual or perceived favoritism or preferential treatment" (emphasis added), it is incumbent upon the Prosecution to indicate precisely what those circumstances are. The record is completely devoid of any evidence of actual or perceived favoritism or preferential treatment that Appellant provided to A1C CG.

After taking a fresh, impartial look at the evidence, making our own independent determination as to whether the evidence constitutes proof of each required element of dereliction duty for failing to refrain from pursuing an unprofessional relationship with A1C CG, and making allowances for not having personally observed the witnesses, we are not convinced of Appellant's guilt beyond a reasonable doubt and thus find the evidence factually insufficient. Accordingly, we set aside the finding of guilt to Specification 5 of Charge I.

**2. Sexual Assault**

To sustain a conviction for sexual assault as alleged in Specification 1 of Charge II, the Government was required to prove: (1) that Appellant committed a sexual act upon A1C CG, to wit: penetration of her vulva with his penis; (2) that Appellant did so by causing bodily harm to A1C CG, to wit: penetra-

---

[9] Several times during the trial, the Prosecution referred to A1C CG and some of the other junior Airmen as E-2s. However, all specifications list their rank as Airman First Class (E-3).

tion of her vulva with his penis; and (3) that Appellant did so without A1C CG's consent.[10]

Appellant conceded that he engaged in the charged sexual act with A1C CG. The only fact in dispute was whether he did so without her consent. While there is no set of responses, or lack thereof, that proves that an individual did not consent to sexual activity, there are a number of significant actions that A1C CG admitted to taking that raise serious doubt about her state of mind or whether she had adequately communicated her lack of consent. On the one hand, she testified that she said "no" and attempted to scoot away from him during the sexual encounter. On the other hand, she also testified that she asked Appellant to wear a condom, which he agreed to do, and that Appellant's actions after the alleged sexual assault were strikingly inconsistent with what she perceived would have been appropriate for someone who had just knowingly forced her to engage in a sexual act. She said he acted "normal." Not only did his response appear inconsistent with someone who had just committed sexual assault, her actions after the sexual encounter also appeared inconsistent with someone who had just been sexually assaulted by a recent acquaintance.

A1C CG engaged in casual conversation with Appellant, she prepared dinner with him, she sat down with him to eat dinner and watch a movie, and they ended up back in Appellant's bedroom, where she chose to sleep for the night, in his bed, next to him. The following morning after he drove her back to her dorm, rather than stay as far away from him for as long as possible, she asked him to wait for her and drive her to the BX for her part-time job. Appellant told AFOSI a couple of days later that A1C CG attempted to kiss him, but he rebuffed her because he did not want to be seen in public kissing her and she became angry and stormed off. AFOSI never attempted to review the BX security camera footage to confirm Appellant's account. A1C CG denied it. However, the text messages she sent to Appellant after getting off work at the BX seem to corroborate Appellant's version, when she referred to "the whole sneaking around issue." In addition, the text messages, despite containing A1C CG's complaints that Appellant "just wants sex," were completely devoid of any allegation that the "sex" was nonconsensual. On the contrary, her concerns seemed focused on Appellant's unwillingness to commit to a serious relationship and that she was not interested in him because she needed "someone that I can actually get to know." She lamented that "I don't never see us being serious on any level due to the fact of your current

---

[10] *Military Judges' Benchbook*, Dept. of the Army Pamphlet 27-9 at 573–74 (10 Sep. 2014).

situation," apparently responding to his comment that he was not yet over a previous relationship. It was not until the following day, when her flight chief asked her if she hadn't gotten the "Allen Brief," that A1C CG began to categorize the sexual encounter as a sexual assault.

As an appellate court, we have not had the opportunity to personally observe A1C CG's testimony. However, we have reviewed the same video-recorded AFOSI interviews of A1C CG and Appellant that were played for the court members and are in the same position as the court members to independently evaluate A1C CG's and Appellant's demeanor in telling the investigators their respective versions of the event. After taking a fresh, impartial look at the evidence, making our own independent determination as to whether the evidence constitutes proof of each required element of sexual assault, and making allowances for not having personally observed the witnesses as they testified, we are not convinced of Appellant's guilt beyond a reasonable doubt and thus find the evidence factually insufficient. Accordingly, we set aside the findings of guilt to Specification 1 of Charge II and to Charge II.

### III. CONCLUSION

The findings of guilt to Specification 5 of Charge I, to Specification 1 of Charge II, and to Charge II are **SET ASIDE** and they are **DISMISSED WITH PREJUDICE**. The findings of guilt to Specifications 1, 3, and 4 of Charge I are correct in law and fact, and are **AFFIRMED**. The sentence is **SET ASIDE**. A rehearing on sentence is authorized. Article 66(c), UCMJ 10 U.S.C. § 866.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court